## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

This affidavit is submitted in support of a United States District Court search and seizure warrant for 4209 New Hampshire Avenue, NW, Washington, D.C. (hereinafter referred to as "target residence").

## BACKGROUND AND EXPERIENCE

1.      Your affiant has been a police officer with the Montgomery County Department of Police for 30 years and is currently assigned to the Fraud Section and the United States Secret Service Metropolitan Area Fraud Task Force, Washington Field Office. Your affiant has been employed in this dual capacity since December 1993. Your affiant's responsibilities include the investigation of possible criminal violations in relation to the Financial Institution Reform, Recovery, and Enforcement Act, the Money Laundering Control Act, and other related fraud offenses involving U.S. obligations and securities. During that time your affiant has also investigated numerous bank fraud schemes.

2.      As a Federal Task Force Officer, I am authorized to investigate violations of the laws of the United States of America and I am a law enforcement officer with authority to execute arrest and search warrants issued under the authority of the United States of America.

3.      Your Affiant has also seized and examined financial documents relating to hidden assets of fraud perpetrators. I have participated in dozens of debriefings of individuals charged with State and federal financial crimes, and I have served as a financial crime investigations instructor at the Montgomery County Department of Police Public Safety Academy since 1994.

4.   Specifically, your affiant knows that persons involved in fraudulent activity pertaining to the alteration of U.S. currency and/or the manufacture or possession of counterfeit currency, will commonly generate and maintain writings, books, receipts, business ledgers, lists, notations and other memoranda to assist in their criminal enterprises. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate business keep similar materials.

5.   Likewise, your affiant knows that persons involved in fraudulent activity pertaining to the alteration of U.S. currency and/or the manufacture or possession of counterfeit currency frequently keep materials memorializing past transactions, the status of accounts, inventories, income, and expense records, and the like, all of which are pieces of relevant evidence regarding the question of whether one or more persons are engaging in the "Black Money Scam" described in this affidavit, as well as other legal considerations. Your affiant is aware that these records are commonly kept in secure locations such as residences, places of business, and in bank safe deposit boxes to maintain ready access to them and to conceal these records from law enforcement authorities.

6.   Also, your affiant knows that it is common for individuals involved in fraudulent activity pertaining to the alteration of U.S. currency and/or the manufacture or possession of counterfeit currency to secrete proceeds, records of transactions, and telephone numbers of their associates in the criminal enterprise in secure locations within their residences, their place of business, and safe deposit boxes to maintain ready access to them and to conceal them from law enforcement authorities.

7.   Your affiant knows that, due to federal regulations, the IRS requires that any cash

transaction exceeding $10,000.00 must be reported to the IRS. In order to avoid such reporting, individuals involved in fraudulent activity pertaining to the alteration of U.S. currency and/or the manufacture or possession of counterfeit currency often "structure" their currency transactions by breaking down such transactions into several smaller transactions. Your affiant knows that this process creates additional records which create a "paper trail" of these transactions. Once again, your affiant knows that these records are also maintained by individuals involved in fraudulent activity pertaining to the alteration of U.S. currency and/or the manufacture or possession of counterfeit currency at a location where they would have ready access to them.

8. Your affiant knows that individuals involved in fraudulent activity pertaining to the alteration of U.S. currency and/or the manufacture or possession of counterfeit currency take or cause to be taken photographs of themselves, their associates, their properties, and the product of their illicit trade.

9. Your affiant further knows that individuals involved in fraudulent activity pertaining to the alteration of U.S. currency and/or the manufacture or possession of counterfeit currency will use businesses that have all the appearances of a legitimate business to disguise the proceeds of their fraudulent dealing.

10. Furthermore, your affiants know that with the technological advances in society today, individuals involved in fraudulent activity pertaining to the alteration of U.S. currency and/or the manufacture or possession of counterfeit currency utilize electronic equipment such as computers, facsimile machines, pagers, telex machines and telephone answering machines to facilitate their illicit transactions.

11.  For these reasons, your affiant believes that the articles listed in Attachment A are evidence of criminal activity that may be located in the target residence.

12.  The statements contained in this Affidavit are based in part on information provided by Special Agents of Immigration and Customs Enforcement, and Detectives of the Montgomery County Department of Police; on documents gathered during the course of this investigation; on interviews conducted during the course of this investigation; and on my experience and background as a Task Force Officer. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## THE BLACK MONEY SCAM

13. The defendant and others participated in a fraudulent scheme whereby they would convince unsuspecting individuals ("targeted victims" or "victims") in Maryland and elsewhere that they could transfer the image of $100 and/or $50 bills (U.S. currency) onto pieces of white paper cut in the shape and size of U.S. currency. This scheme is commonly referred to by federal law enforcement authorities as the "Black Money Scam."

  a.  As part of this scheme, the defendant and others would alter real U.S. currency by coating it in a very dark chemical and/or powder solution.

  b.  Targeted victims would then be shown two white strips of paper, which were cut in the shape and form of U.S. currency.

4

  c. These white strips of paper contained "ghost images," or impressions, of real $100 and/or $50 bills.

  d. The victims would be told, in substance, that the two strips of paper were, in fact, actual Treasury paper ("film") from which "real" U.S. currency was made.

  e. Chemicals and/or powder would be placed on the two white strips of paper, causing the white strips of paper to turn a very dark color—almost black.

  f. The victims would be asked to provide a real $100 or $50 bill, which would then be sandwiched between the two (now dark) strips of paper.

  g. The dark color would be washed away with water and/or chemicals, revealing two $100 and/or $50 bills that looked identical to real U.S. currency.

  h. The defendant and others would represent to victims that the $100 and/or $50 bills purported to be created from the formerly white strips of paper were "real" U.S. currency.

  i. In truth, however, through sleight of hand, the original two white strips of paper would be switched and replaced with real U.S. currency coated in a chemical and/or powder solution. Accordingly, when "washed," real U.S. currency would be revealed.

  j. In another variation of the Black Money Scam, real U.S. currency was altered, from the outset, with chemicals to look almost black. Again, when "washed," real U.S. currency would be revealed.

  k. As part of the Black Money Scam, large sums of money would be requested from the victims with the promise that the victims would double any cash investment.

5

l. The defendant and others never intended to double the victims' cash investment.

## PROBABLE CAUSE

14. On April 19, 2005, an undercover officer (hereinafter "the U/C") met with the defendant, Jean Jacques Dzimtchon, at the Montgomery County Airpark located at 7940 Airpark Road, Gaithersburg, Montgomery County, Maryland. During this meeting, the defendant demonstrated to the U/C a technique he claimed would effectively counterfeit U.S. currency. Specifically, the defendant obtained a $50 bill from the U/C, and then removed two pieces of white paper from an envelope in his briefcase. He then cut the white paper into the form and shape of U.S. currency, donned a surgical mask and gloves, and applied some unknown liquid to the $50 bill and paper before sealing them in tin foil. The chemicals blackened both the white papers and the bill.

15. The defendant later removed the bill and paper from tin foil, rinsed them in liquid, and presented two additional $50 bills, claiming they had been manufactured from the original bill submitted by the U/C. The defendant then displayed a handheld ultraviolet light, scanned it over the bills, and advised the U/C that the bills would remain authentic in appearance for two years. The defendant provided those bills to the U/C, and all three bills are in fact legitimate U.S. currency.

16. On April 22, 2005, the U/C met with the defendant at a restaurant in Rockville, Maryland. During that meeting, the defendant indicated that he possessed $860,000 in black money. The defendant instructed the U/C to bring $430,000 to a final meeting, so he could double the U/C's currency.

17. On May 2, 2005, the U/C met with the defendant at a Starbucks coffee shop in Rockville. The defendant repeated his desire to take $430,000 in legitimate U.S. currency of the U/C and, through the "black money" process, manufacture an additional $430,000 for the U/C.

18. On May 24, 2005, the U/C met with the defendant at the Montgomery County Airpark. During this meeting the U/C provided the defendant with $40,000 in U.S. currency. The U/C advised the defendant that the U/C wished to see the results of the process utilizing $40,000, prior to providing the defendant with the balance of the previously agreed upon $430,000. The defendant donned a surgical mask and gloves, and placed the $40,000 U.S. currency into one stack. The defendant then sealed the stack of currency with tin foil, duct tape and electrical tape. The defendant then washed the stack of currency in a series of plastic containers containing an unknown liquid. The defendant then placed the stack of currency under pieces of wood, in an attempt to apply pressure to the stack of currency.

19. The defendant then repeated this process using a stack of white paper, which was cut into the form and shape of U.S. currency. The stack of white paper was similar in size and shape to the stack of $40,000 U.S. currency.

20. The defendant then related to the U/C that stacks of U.S. currency and white paper had to be compressed for 24 hours. The defendant agreed to meet the U/C in 24 hours, and at that time, the white paper would be applied to the U.S. currency, producing $80,000 in U.S. currency. Both parties agreed to leave the stacks of U.S. currency and white paper at the Montgomery County Airpark until that time. The defendant then exited the area.

21. Agents subsequently confirmed that neither of the stacks left at the Montgomery

County Airpark by the defendant contained U.S. currency. The defendant was apprehended in his vehicle a short time later. A search of the defendant's vehicle resulted in the recovery of the $40,000 U.S. currency, previously provided to the defendant by the U/C. Also recovered from the defendant was a Maryland driver's license in the name of Jean Jacques Dzimtchon that included a photograph of the defendant.

22.   During processing, the defendant provided his residential address to agents as 4209 New Hampshire Avenue, NW, Washington, D.C. The defendant related that he lived at this address with his wife, Kimberly Davis. Jean Jacques Dzimtchon had previously provided this address to Immigration and Customs Enforcement and was the address on record in Dzimtchon's alien registration file. A search of Dzimtchon's vehicle resulted in the recovery of documents, including vehicle maintenance records and auto insurance, listing Dzimtchon's address as 4209 New Hampshire Avenue, NW, Washington, D.C. In addition, a query of several commercial databases including Auto Track and Choice Point list Dzimtchon's address as 4209 New Hampshire Avenue, NW, Washington, D.C. Finally, a check with a U.S. Postal Inspector led to a confirmation that Dzimtchon currently receives mail at the target address.

## CONCLUSION

23. Your affiant also believes that there is probable cause to believe that the premises 4209 New Hampshire Avenue, NW, Washington, D.C. contains property that constitutes evidence of the commission of violations of Title 18, United States Code, Section 471. It is respectfully requested that a search warrant be issued for 4209 New Hampshire Avenue, NW, Washington, D.C.

_____
Task Force Officer Randolph Bottenus
United States Secret Service

Sworn and subscribed before me on this 25th day of May, 2005.

_____
United States Magistrate Judge
ALAN KAY
U.S. MAGISTRATE JUDGE

**ATTACHMENT A**

Books, records, invoices, receipts, records of real estate transactions, notes, ledgers, checks, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts and cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer, and/or concealment, and/or expenditure of money; including evidence contained in safes, locked boxes, or other receptacles.

Books, records, notes, ledgers, checks, bank statements, and other papers relating to all aspects of fraud, including Bank Fraud, Checking Account Fraud, Credit Card Fraud, ATM Fraud, and Loan Fraud.

Information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. This media includes, but is not limited to, diskettes, hard disks, removable cartridges, system RAM, tapes, laser and compact disks, video cassettes, and any other media which is capable of storing magnetic, optical, and/or binary coding;

Electronic devices which are capable of analyzing, creating, displaying, converting, receiving, or transmitting electronic and/or magnetic computer impulses or data. These devices include, but are not limited to, computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, optical scanners, encryption circuit boards, hard drives, and other computer related electronic devices;

Instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The items to be seized could include, but would not be limited to, operating systems, application software, utility programs, compilers, interpreters, and any other programs or software used to communicate with computer hardware or peripherals, either directly or indirectly, via telephone lines, radio signal, or other means of transmission;

Written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related device;

**ATTACHMENT A - CONTINUED**

Electronic equipment, such as telex machines, facsimile machines, currency counting machines, telephone answering machines, and related manuals used to generate, transfer, record, and/or store financial transaction information. Additionally, computer software, tapes, disks, audio tapes, and the contents therein, containing the information generated by the aforementioned electronic equipment;

Unites States currency, precious metals, jewelry, and financial instruments, including stocks and bonds;

Photographs, including still photos, negatives, video tapes, films, undeveloped film, slides, and the contents therein, in particular photographs of co-conspirators and assets.

Address and/or telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, financial institutions, and other individuals or businesses with whom a financial relationship exists;

Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, canceled envelopes, rental, purchase, or lease agreements, and keys;

White paper ("film"), liquid or chemical solutions, as well as ink, surgical gloves and masks, powders, ultra-violet lights, duct tape, tin foil, and electrical tape, used in the Black Money Scam, as described in the affidavit in support of the search warrant.

## ATTACHMENT B

### DESCRIPTION OF TARGET ADDRESS

4209 New Hampshire Ave., N.W., Washington, D.C. is described as an end unit, two-story row home with attic and basement. The residence consists of brown brick with white trim, and has a white front door with a window. The number "4209" is displayed in black that is mounted to the trim on the left side of the front door.